THE UNITED STATES OF AMERICA,
THE STATE OF FLORIDA and JAEL
CANCEL,

        Plaintiffs,

v.

        Case No: 6:14-cv-512-Orl-28TBS

CENTRAL MEDICAL SYSTEMS, LLC,
ALAN T. HARLEY, JOAN HARLEY,
ARTHUR WRIGHT and MEDDEX
SOLUTIONS, LLC,

        Defendants.

---

# ORDER

On October 8, 2018, Defendants Central Medical Systems, LLC (CMSI), Alan T. Harley, Joan Harley, Arthur Wright, and Meddex Solutions, LLC (Meddex) filed a Motion to Quash Order Granting Application for Prejudgment Remedies and to Dissolve Prejudgment Writs of Attachment and Garnishment (Doc. 79).[1] Defendants also sought an expedited hearing on their motion pursuant to 28 U.S.C. § 3101(d)(2). Upon the filing of Defendants' motion, the Court ordered the United States (Government) to respond, which it did on October 15, 2018. (Doc. 84). The Court held the statutorily prescribed hearing on October 16, 2018. At the hearing, Defendants and the Government presented

---

[1] The Motion to Quash (Doc. 79) identifies CMSI and Alan T. Harley as the parties seeking to quash the prejudgment remedies. However, at the hearing on the motion, counsel for CMSI, Alan T. Harley, and Joan Harley argued that the prejudgment remedies should be quashed in their entirety. Based on the testimony at the hearing and the arguments advanced in the Motion, the Court construes the Motion to Quash as being made on behalf of all Defendants.

live witness testimony, documentary evidence, and legal arguments. Upon consideration of the evidence presented by the parties, the Court now denies Defendants' Motion to Quash.[2]

## I. Background

### A. Procedural Background

The underlying case is a *qui tam* action that was filed under seal by relator Jael Cancel on March 28, 2014. On January 18, 2018, the Government elected to intervene in part in the case. (Doc. 34). The Government filed its original Complaint in Intervention (Doc. 39) on March 23, 2018. This initial Complaint named only CMSI and Alan Harley as defendants. CMSI and Alan Harley answered on May 4, 2018.

On July 27, 2018, the Government filed two *ex parte* motions: (1) Application for Pre-Judgment Remedies (Doc. 60) and (2) Motion for Joinder of Defendants (Doc. 61). The Application for Prejudgment Remedies sought, pursuant to 28 U.S.C. §§ 3101, 3102, and 3104, to attach several vehicles owned by Alan Harley, Joan Harley, and Arthur Wright and to garnish the accounts in which Defendants had a substantial, nonexempt interest. (See Doc. 60 at 8–9). The Government supported its application with an affidavit completed by Department of Justice Investigator Mitchell Blum and outside Civil Investigator Mary Vanatta. (See Doc. 60-5 at 1). The Motion for Joinder sought to join

---

[2] Defendants CMSI and Alan T. Harley also filed an Objection to Requests for Prejudgment Financial Discovery, Motion for Protective Order, and Motion to Quash Non-Party Subpoena (Doc. 80). The parties did not address this filing at the hearing. In its Response, the Government noted that it will "endeavor in good faith to resolve [the] objections [relating to the breadth of financial discovery sought] with defense counsel without court intervention." (Doc. 84 at 12). The Government further noted that it is not seeking financial discovery from third-party Brightree LLC but rather seeks only "general discovery into the fraud perpetrated by Harley and CMSI." (Id. at 13). Based on the representations of the Government, the Court will deny this discovery motion without prejudice.

Joan Harley, Wright, and Meddex as named debtor-defendants. (See Doc. 61 at 1–2). In a single *ex parte* Order dated August 16, 2018, United States Magistrate Judge Thomas B. Smith granted the Government's Motion for Joinder and its Application for Prejudgment Remedies. (See Doc. 62). The Order instructed the Clerk of the Court to issue notices of Writs of Attachment and Garnishment.

On August 24, 2018, the Government filed its Amended Complaint in Intervention (Doc. 66), naming Joan Harley, Wright, and Meddex as additional defendants. On September 7, 2018, the United States Marshals Service executed the Writs of Attachment and Garnishment. (See Doc. 72). Defendants now seek to quash and dissolve those writs. Defendants argue that the writs must be dissolved because the Government failed to comply with the relevant statutory and constitutional requirements. The Government disagrees.

Defendants sought an expedited hearing pursuant to 28 U.S.C. § 3101(d)(2). At the hearing, Defendants called Investigator Blum, Joan Harley, Wright, and Alan Harley. The Government cross-examined these witnesses and presented documentary evidence. The Government also called Investigator Blum. At the conclusion of the hearing, the Court took the matter under advisement.

### B. Factual Background

Because this is a unique case with constitutional implications, a recitation of the relevant facts is appropriate. CMSI, which is owned by Alan Harley, is a limited liability company that "provides surgical dressings, durable medical equipment (DME), or other Medicare reimbursable items to patients." (Doc. 66 at 4). Meddex, which was previously owned by Alan Harley but is now owned by Wright, is also a limited liability company that "provides surgical dressings, DME, or other Medicare reimbursable items to patients." (Id.

at 5). Alan Harley is the "managing member of and operates CMSI, [while] Wright is the managing member of and operates Meddex." (Id. at 1). At the hearing, Wright testified that he had worked close to full time at CMSI, receiving $10,000 a month in compensation. Joan Harley is Alan Harley's wife, and she allegedly was a manager at CMSI until around January of 2016. She also managed ATH investments.[3] (See id. at 4, 24–25).

The Government alleges that since 2009, "CMSI, through Alan Trent Harley, has been submitting inflated billing for surgical dressing, DME, or other healthcare items that include upcoded wound care supplies or wound care supplies that were not provided to patients in order to receive inflated and ineligible payments from the United States." (Id. at 8). The Government based this allegation on interviews with "multiple then-current and former employees of CMSI" and a review of documentary evidence. (Id.). Because of this suspected fraud, the Center for Medicare and Medicaid Services (CMS)[4] "initiated a payment suspension, including a targeted prepayment review of suspect codes." (Doc. 60-5 at 7). When a Medicare provider like CMSI is under a payment suspension, any claims submitted by the company for payment are not disbursed directly into the company's bank account. Rather, as Investigator Blum explained at the hearing, that payment is placed in an escrow account and held while Medicare investigates the alleged fraud. Here, CMS placed CMSI on payment suspension on February 6, 2018. Harley testified that he was notified of that suspension on February 20, 2018.

---

[3] ATH is the holding company through which Alan and Joan Harley sold Meddex to Wright
[4] CMS is the agency responsible for paying out claims on behalf of Medicare. Companies like CMSI provide wound care supplies to Medicare beneficiaries and then submit claims for payment to CMS. CMS then pays those claims.

On February 21, 2018, the Harleys transferred ownership of Meddex to Wright through ATH. (See id.). At the hearing, the parties vigorously debated the circumstances surrounding this transaction. Defendants paint this transaction as a "bona fide, [arm's]-length transaction." (Doc. 79 at 11). Alan Harley stated in his affidavit that after negotiation, Wright offered him a $150,000 promissory note in exchange for ownership of Meddex. (See Doc. 79-1 at 8). Wright stated in his affidavit that he valued Meddex based on his experience in the medical supply field. As discussed at the hearing, after this alleged negotiation and valuation, Alan Harley and Wright executed a purchase agreement that called for quarterly payments of $13,337.00 with the first payment due on May 21, 2018. However, Alan Harley testified at the hearing that he had yet to receive a payment from Wright.

The Government, on the other hand, paints this transaction as a quick, under-the-table deal between two longtime business partners aimed at circumventing CMSI's payment suspension and allowing Meddex to operate as CMSI's alter ego.[5] In support of this contention, the Government points to a number of facts, including: (1) that CMSI and Meddex listed the same phone number in their official state of Florida records; (2) that Wright's email address contained the web address for CMSI; (3) that Meddex's physical address was, prior to CMSI's relocation, the same as CMSI's physical address; (4) that CMSI and Meddex are listed together on official service authorization forms given to

---

[5] The Government did not allege in its submissions to the Court that Meddex was legally CMSI's alter ego. The Government did, however, present facts tending to show that Meddex essentially took over CMSI's business after the imposition of the payment suspension. Because the Government has not alleged that Meddex was CMSI's alter ego as a matter of law, the Court does not reach that question. The Court has, however, considered the facts tending to show that Meddex took over CMSI's operations because of the payment suspension.

patients; (5) that Meddex submitted to Medicare a voided check listing a CMSI bank account on its application for an electronic funds transfer authorization; (6) that 436 beneficiaries billed for services by CMSI before the imposition of the CMSI payment suspension were billed by Meddex after the imposition of that suspension; (7) that prior to the CMSI payment suspension, CMSI was billing Medicare hundreds of thousands of dollars a month for supplies and Meddex was billing nothing, whereas after the suspension, CMSI's monthly billing reduced to zero and Meddex's increased to hundreds of thousands of dollars; and (8) that Meddex was sold for a $150,000 promissory note but then began billing Medicare hundreds of thousands of dollars *per month*. (See Doc. 60-5 at 8–10, 15–16, 18–20; see also Doc. 79-1 at 8).

Alan Harley's responses to the Court's questioning at the hearing further corroborate the suggestion that ill motives pervaded this transaction. Alan Harley testified that: (1) he learned of the CMSI payment suspension one day and sold Meddex the next; (2) he did not advertise Meddex as for sale; (3) he did not talk to any other potential purchasers besides Wright; (4) he did not seek an evaluation of the business's worth from a third party; (5) he neither met with nor hired an attorney to handle the sale of Meddex; (6) no attorney attended the closing of the sale or reviewed the sale documents prior to the closing; (7) he does not recall the length of the purchase agreement; (8) he does not know whether the contract contained any provisions for accounts receivable and payable or whether it contained a provision governing the transfer of personal property; (9) he does not know the interest rate on the promissory note; (10) he has not received any payments from

Wright pursuant to the promissory note; and (11) Medicare pays about 70% of what is billed and a company receives on average about 70–80% of the amount Medicare disburses.[6]

After the sale, Meddex billed Medicare and received disbursements for three months. However, Wright testified at the hearing that CMS imposed a payment suspension on Meddex on June 1, 2018. Presumably, this payment suspension operates similarly to the suspension imposed upon CMSI. Investigator Blum testified that despite the suspension, Medicare inadvertently disbursed around $140,000 to Meddex in July of 2018—one month after the imposition of the payment suspension. On September 7, 2018, the Government served the Writs of Attachment and Garnishment on all Defendants. Investigator Blum testified that the inadvertent disbursement went into the Meddex bank account that is subject to the Writ of Garnishment. But at the time the answer to the Writ of Garnishment was returned, that account contained only $7,000. (See Doc. 71 at 1).

## II. Discussion

### A. Section 3101(d)(2) Hearing

Section 3101(d)(2) specifically defines the scope of the post-deprivation hearing. The hearing is limited to consideration of: (1) "the probable validity of the claim for the debt for which such remedy was granted and of any defense or claim of exemption asserted by such person"; (2) "compliance with any statutory requirement for the issuance of the prejudgment remedy granted"; (3) "the existence of any ground set forth in subsection (b)"; and (4) "the inadequacy of alternative remedies (if any) to protect the interests of the United States." 28 U.S.C. § 3101(d)(2)(A)–(D). At the hearing, the parties addressed the first three of these issues.

---

[6] As explained below, this tends to show that the company was sold for far less than it is worth.

7

Section 3101(d)(2) does not instruct courts on the appropriate burden of proof at the hearing. However, decisions from other courts provide some guidance. Courts have noted that at the post-deprivation hearing authorized by 28 U.S.C. § 3101(d)(2), the "Government and the debtor defendants generally engage in a burden-shifting exercise where the debtor bears the initial burden of putting forward evidence that places the Government's showing of the probable validity of the debt in dispute." United States v. Berkeley Heartlab, Inc., 225 F. Supp. 3d 460, 465 (D.S.C. 2016). This does not require a defendant to "present affirmative evidence to successfully challenge the Government's showing." United States ex rel Doe v. DeGregorio, 510 F. Supp. 2d 877, 885 (M.D. Fla. 2007). Rather, a defendant's "statutory burden at the post-deprivation hearing is to place in dispute the Government's showing of probable validity . . . through cross-examination of the affiant or other witnesses relied on by the Government." Id.

However, if the Government's affidavit is "sufficiently particularized" and the affiant's "sources of information are shown to be reliable because they have personal knowledge of the events about which they provided information, [a defendant] must come forward with affirmative evidence to rebut the Government's showing." Id. at 886. In other words, if the Government has made a sufficient showing, a defendant must present "some substantive evidence at the hearing." Id. (quoting United States v. Teeven, 862 F. Supp. 1200, 1218 (D. Del. 1992)).

As discussed at the hearing, the Court here finds that the burden-shifting framework that applies to the probable-validity-of-the-debt portion of the statute also applies to the other portions of the statute evaluated at the § 3101(d)(2) hearing. The Court further finds that the Government's affidavit is sufficiently particularized based on personal information

and recorded data. Therefore, Defendants bear the higher burden of coming forward with "affirmative evidence to rebut the Government's showing." Id.

**B.    Statutory Challenges**

*1.    Probable Validity of Claims to Recover Debt*

Defendants first challenge the Government's ability to establish that its claim for debt is probably valid. In order to obtain a prejudgment remedy, 28 U.S.C. § 3101(c)(1) requires the Government to include with its application an "affidavit establishing with particularity to the court's satisfaction facts supporting the probable validity of the claim for a debt and the right of the United States to recover what is demanded in the application." 28 U.S.C. § 3101(c)(1). This "probable validity" standard does not require proof rising to the level of that required at trial but rather requires only that the Government meet the probable cause standard. See Teeven, 862 F. Supp. at 1217 n.22. To meet this standard, the Government may "rely on [the Government's] application and affidavit, respond to the challenges raised by the Defendant, and offer any other evidence during oral arguments that they have to support the probable validity of the debt." Id. at 1217.

Defendants argue that the Government has not established the probable validity of the debt because "the Court has nothing before it upon which to base a finding that the Government's [False Claims Act] claims are probably valid." (Doc. 79 at 23). Defendants assert that the Government must come forward with "specific, sworn averments to show by competent evidence that [Defendants] actually submitted . . . false claim[s] to the Government." (Id.). The Government responds that it has identified two sets of fraudulent conduct that created a debt to the Government now owed by Defendants. First, the Government points to "[Alan] Harley and CMSI's submission of fraudulent claims to the United States since 2009." (Doc. 84 at 4). Second, the Government points to "the

Defendants' conspiracy to submit claims in order to circumvent Medicare's payment suspension of CMSI in 2018." (Id.). In the Government's view, both sets of conduct create a probably valid debt that the Government has a right to recover.

The submission of a fraudulent claim creates a debt for purposes of this statute. See Berkeley Heartlab, 225 F. Supp. 3d at 466 ("[C]ourts have held that 'a party that violates the [False Claims Act] incurs a debt to the [G]overnment as soon as the [G]overnment pays the fraudulent claim. Thus by alleging that the defendants submitted false claims and made false statements under the [False Claims Act], the [G]overnment sufficiently alleges the existence of a debt under [this statute]'" (quoting United States v. First Choice Armor & Equip., Inc., 808 F. Supp. 2d 68, 79 (D.D.C. 2011))). Here, the Government alleges that Alan Harley and CMSI submitted false claims by upcoding and overbilling and that all Defendants conspired to submit false claims through the Meddex transaction. The Government has thus alleged that a debt exists.

Although Defendants dispute the probable validity of the Government's claim for that debt—arguing that the Government's claims are based on conclusory, unparticularized allegations—the Court disagrees. As to the alleged upcoding and overbilling, the Government's affidavit states that "[Alan] Harley and CMSI presented, or caused to be presented, false billings to Medicare for the purposes of reimbursement." (Doc. 60-5 at 2). Specifically, the affidavit alleges that, after interviewing witnesses, reviewing financial documents, reviewing Medicare billing information, and reviewing Medicare enrollment documents, the investigators determined that "from 2009 through at least June of 2015— and, upon information and belief, through the present—CMSI and Harley submitted claims for payment for surgical dressings and other items that were for a higher paying code than

is allowed—that is, upcoded—and claims for items not provided to patients, specifically by billing for greater quantities of items than were provided to patients." (Id. at 2–3). Investigator Blum's testimony at the hearing corroborates this information from the affidavit. Crediting the affidavit and Investigator Blum's hearing testimony, the Court finds that the Government sufficiently established the probable validity of this claim for debt.

As to the alleged Meddex sale conspiracy, the Government has presented sufficient facts to establish the probable validity of that debt. The evidence from the Government's affidavit and the hearing demonstrates that the Meddex sale was hurriedly consummated by Alan Harley, Joan Harley, and Wright immediately after CMS placed CMSI on payment suspension. Moreover, the company was sold for significantly less than it was worth. Alan Harley testified that Medicare pays a provider like Meddex about 70% of what is billed and a company receives on average about 70–80% of that amount. In the three months following the CMSI suspension and the Meddex sale, Meddex submitted claims totaling $939,994.47 to Medicare for payment. That means, using Alan Harley and Wright's rough formula for calculating net proceeds, Meddex's gross revenue was $460,597.29 *in just three months*. Selling such a valuable company to a long-time business associate, without negotiation, advertisement, any effort to solicit bids, or the involvement of a lawyer—for a $150,000 promissory note on which no payment has been made—are actions inconsistent with an arm's-length transaction. The timing of the sale also undermines Defendants' insistence that the sale was an arm's-length business deal. It occurred only 24 hours after Alan Harley was notified of the CMSI payment suspension. And the testimony of Alan Harley and Wright at the hearing only lends credence to the Government's argument that

the transaction was not legitimate. Based on this evidence, the Court finds that the sale of Meddex was not, as Defendants claim, an arm's-length business transaction.

The Government also presents evidence showing that hundreds of former patients who received products through CMSI began receiving products through Meddex immediately after the CMSI payment suspension was implemented. This is out of the ordinary because, as Investigator Blum explained at the hearing, a payment suspension does not affect patients and they would not have to move to a different provider just because their provider was under suspension. Further, the Government presents a panoply of evidence tending to show that the Harleys and Wright consummated the Meddex sale to circumvent the payment suspension levied on CMSI. This would mean that the Meddex claims submitted after the CMSI suspension and the Meddex sale were fraudulent. Based on the totality of evidence surrounding the Meddex sale, the Court finds that the Government has shown the probable validity of the debt stemming from the allegedly fraudulent Meddex claims.

The final showing the Government is required to make under this portion of the statute is that it has a right to recover the amount of debt it demands in its application. The Government makes this showing. The False Claims Act, which governs this action, provides that "any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or] conspires to commit [either of the violations above] is liable to the United States Government for a civil penalty . . . plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1)(A)-(C). The Government claims

in its application a debt of "at least $480,504.50." (Doc. 60 at 5). This represents the amount allegedly billed by Meddex in circumvention of the CMSI payment suspension. (Doc. 60-5 at 20). This amount does not include the treble damages or civil penalties to which the Government would be statutorily entitled. (See id.). If those figures are included, the Government's alleged debt claim rises to at least $57,066,988.50. (See id.). Therefore, if the Government proves all of the fraudulent payment submissions and the conspiracy it alleges, it would have a right to recover from Defendants far more than the $480,504.50 it demands in its application. This subsection of the statute is therefore satisfied.

In sum, the affidavit of the Government's investigators and the evidence adduced at the hearing establishes both the probable validity of the debt and the right of the Government to recover the amount it demands. While Defendants point out some weaknesses in the Government's evidence, they have not carried their burden of affirmatively presenting evidence—through credible testimony or otherwise—that refutes the Government's showings. Therefore, the Court finds that the Government has complied with this portion of the statute.

### 2. Grounds Set Forth in § 3101(b)

In addition to the probable validity of the debt, the Government must also show reasonable cause to believe that one of the statutory grounds for issuance of a prejudgment remedy exists. See 28 U.S.C. § 3101(b). Both parties agree that two of the enumerated statutory grounds are relevant here. The first is that the debtor "has or is about to assign, dispose, remove, conceal, ill treat, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States." Id. § 3101(b)(1)(B). The second is that the debtor "has or is about to convert the debtor's property into money, securities, or

evidence of debt in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States." Id. § 3101(b)(1)(C).

Defendants argue that the Government has not demonstrated the existence of either of these grounds. They contend that Wright was merely a business associate of Alan Harley, that the sale of Meddex was a bona fide, arm's-length transaction, and that neither the Harleys nor CMSI have received any benefit from Meddex after the sale. (Doc. 79 at 11–13). These facts, they argue, show that Defendants have not done anything to any property or money that would hinder the Government in collecting its debt. In support of their argument, Defendants rely heavily on several cases in which courts found that selling houses and other property for far less than their value satisfied the 28 U.S.C. § 3101(b) grounds. (See id. at 13–14). Defendants assert that no such conduct occurred here. The Government, on the other hand, argues that the Meddex sale conspiracy "resulted in removing and concealing property (CMSI's claims) with the effect of hindering, delaying, and defrauding the United States." (Doc. 84 at 7). Put another way, the Government argues that by transferring Meddex and using that company to submit claims that CMSI could not collect because of the payment suspension, Defendants fraudulently converted CMSI claims (property) into money, thereby hindering, delaying, and defrauding the Government. (See id.).

At the outset, the question of whether the Harleys and CMSI needed to receive a benefit from Meddex after the sale warrants discussion. Defendants vigorously argued in their motion and at the hearing that the Government had to show that the Harleys or CMSI received some sort of benefit from the sale of Meddex to Wright. (See Doc. 79 at 12–13). Without this, Defendants claim, the Government cannot "close the loop" and satisfy the

statutory grounds required for issuance of the writs.  The Government, on the other hand, argued in response to questioning from the Court at the hearing that it has no obligation to show that CMSI or the Harleys received a benefit.  Rather, the Government contends that it need only show that it suffered some detriment because of the Meddex sale conspiracy.

The Court agrees with the Government.  The language of the statute is clear—there is no requirement that the debtor receive any benefit from transferring or concealing property.  The statute only requires that the concealing or transferring have the "*effect of hindering, delaying, or defrauding the United States.*"  28 U.S.C. § 3101(b)(1)(B)–(C) (emphasis added).  In fact, the statute does not even require that a debtor intend to hinder or defraud the Government.  The sole consideration is the effect of the debtor's actions.  See United States v. Teeven, Civ. A. No. 92–418 LON, 1992 WL 683683, at *7 (D. Del. Aug. 14, 1992) ("[S]ection 3101(b) does not require the Government to show that a debtor's actions are fraudulent or secretive.  Rather, the Government must provide the Court with reasonable cause to believe that the Defendants have or are about to take actions with regard to their properties that would have 'the effect of hindering, delaying, or defrauding the United States.'  The statute contains no 'intent' requirement." (quoting 28 U.S.C. § 3101(b))).

The question for the Court, then, is whether Defendants' actions had the effect of hindering, delaying, or defrauding the United Sates.  They did.  By using the Meddex sale as a vehicle by which to circumvent CMSI's payment suspension, Defendants conspired to convert property (the claims) into money in order to hinder, delay, and defraud the Government.  Defendants had a property interest in the claims submitted to Medicare for payment.  Both Alan Harley and Wright testified that Medicare pays claims based on a

specified fee schedule and that Medicare providers like CMSI and Meddex receive those disbursements for claims submitted. In other words, once a claim for payment is submitted, Medicare providers have "more than an abstract need or desire . . . [or] unilateral expectation of [the payment] . . . . [They] have a legitimate claim of entitlement to [that payment]." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).

Therefore, when Defendants converted the claims into money via the Meddex conspiracy, they were "converting property into money." 28 U.S.C. § 3101(b)(1)(C). This conversion was "prejudicial to the United States" and had the "effect of hindering, delaying, or defrauding the United States." Id. Investigator Blum testified that because CMSI was under a payment suspension, any funds for claims submitted during that suspension would have been held in escrow pending the outcome of the investigation. If the investigation uncovered fraud, the Government could use the money in escrow to satisfy any judgment it received. By circumventing that payment suspension via the Meddex conspiracy, Defendants prevented those funds from being held in escrow. This not only would hinder and delay the Government in collecting its judgment, see DeGregorio, 510 F. Supp. 2d at 889 (noting that converting property into money has the effect of "hindering the recovery of debt by the Government as liquid assets are easily hidden" (internal quotation marks and alterations omitted)), but it also is a new fraud perpetrated on the Government. Therefore, the Court finds that the actions of Defendants relating to the Meddex sale satisfied 28 U.S.C. § 3101(b)(1)(C).

Moreover, testimony from Investigator Blum at the hearing showed that the Government also satisfied 28 U.S.C. § 3101(b)(1)(B). Wright testified that CMS placed Meddex on payment suspension on June 1, 2018. This suspension, like the one imposed

earlier on CMSI, meant that Meddex should have received no funds from claims submitted. Instead, those funds should have been held in escrow. However, as Investigator Blum testified, an error by Medicare resulted in disbursement of $140,000 to the Meddex account that is currently subject to the Writ of Garnishment. This disbursement occurred in July 2018, approximately two months before the Writ of Garnishment was imposed on that account. Despite that substantial payment to the Meddex account, the account contained only around $7,000 when the bank responded to the Writ of Garnishment. (See Doc. 71 at 1). In the two months between the inadvertent disbursement and the Writ of Garnishment being served, Wright and Meddex emptied the Meddex account of nearly all of its funds. This conduct amounts to a disposal, removal, or concealment of property. See 28 U.S.C. § 3101(b)(1)(B). And as explained above, because those funds should have been held in escrow, that disposal, removal, or concealment had the "effect of hindering, delaying, or defrauding the United States." Id. The Court therefore finds that these actions satisfy 28 U.S.C. § 3101(b)(1)(B).

In sum, the Court finds that Defendants have not met their burden of affirmatively presenting evidence to rebut the Government's showings. The Court thus finds that the Government provided grounds for issuance of the prejudgment writs as required by 28 U.S.C. § 3101(b).

### 3. Compliance with Any Portion of the Statute

Defendants next allege that the Government failed to comply with a "threshold statutory requirement for issuance of prejudgment remedies." (Doc. 79 at 9). Specifically, Defendants contend that because the Government submitted its application for the writs before Joan Harley, Wright, and Meddex were added as parties to this lawsuit, the Government failed to comply with § 3101(a). (Id.). This failure, argue Defendants,

prejudiced not only these three "joinder Defendants" but also Alan Harley and CMSI.  (See id. at 9–10).  The Government responds that the magistrate judge allowed joinder of Joan Harley, Wright, and Meddex simultaneously with his issuance of the prejudgment writs and that therefore the Government complied with the statute.  (See Doc. 84 at 7).

Section 3101(a) states that "[t]he United States may, in a proceeding in conjunction with the complaint or at any time after the filing of a civil action on a claim for a debt, make application under oath to a court to issue any prejudgment remedy."  28 U.S.C. § 3101(a).  Defendants urge this Court to consider the plain language of the statute.  However, the plain language of the statute yields a result contrary to the answer they seek.

The language of 28 U.S.C. § 3101(a) clearly states that the United States may seek prejudgment remedies "*in conjunction with the complaint or at any time after the filing of a civil action on a claim for a debt*."  Id. (emphasis added).  The statute is silent regarding the interplay between the joinder of parties and the timing of the application for the writs.  Here, the Government filed its initial Complaint in Intervention on March 23, 2018.  The Government then sought prejudgment remedies on July 27, 2018.  Clearly, the Government sought these prejudgment remedies "after the filing of a civil action on a claim for a debt."  Id.  The Government acted in compliance with the statute.  The Court need not look beyond that.  See United States v. Ron Pair Enters. Inc, 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'" (quoting Caminetti v. United States, 242 U.S. 470, 485 (1917))).

But even if the Court were to credit Defendants' argument that the Government failed to comply with the statute, any resulting error would be harmless.  Defendants cite

United States v. Teeven in support of the proposition that the Government must strictly comply with all portions of 28 U.S.C. § 3101 in order to obtain a prejudgment remedy. (See Doc. 79 at 10 (citing 1992 WL 683683, at *5)). Defendants argue that the extraordinary nature of the remedy means that failure to comply with even minor technical portions of the statute should fell the Government's application. The Court disagrees. The Teeven court did not find that a minor, technical error alone could tarnish the Government's application. Rather, it was the Government's failure to substantially comply with the requirements of the statute that caused the problem. See id. at *4 ("The Government failed to comply with the statutory requirement to make the application under oath, but this noncompliance may be *de minimis* and not fatal to issuance of the writs *if the Government had otherwise substantially complied with the statutory requirements.*" (emphasis added)). The Teeven court reached this decision by analogizing to cases regarding applications for electronic surveillance. See id. ("In each of the . . . cases, the court found a facial insufficiency in the application to be technical and not fatal given the [G]overnment's substantial compliance with the substantive provisions of the statute at issue." (citations omitted)). Here, the Government substantially complied with the statute, and thus a minor timing error does not render its application for prejudgment remedies deficient.[7]

### C. Constitutional Challenge

Defendants' final argument is that the Government failed to comply with the constitutional prerequisites for issuance of the prejudgment writs. They argue that the Government cannot show the requisite compelling need or exigent circumstances. (See

---

[7] Additionally, the three "joinder Defendants" were all present and testified at the § 3101(d)(2) hearing. This further dissipates the effect of any error in timing that may have occurred.

Doc. 79 at 16–18). Defendants base their constitutional argument on the fact that "the Government has not shown any reasonable cause to believe that any property of the putative debtor-defendants has been disposed or converted." (Id. at 15–16). Basically, Defendants use the same argument as they did for the 28 U.S.C. § 3101(b) section. The Government responds in kind, arguing that statutory compliance with 28 U.S.C. § 3101(b) satisfies constitutional requirements.

The Supreme Court has noted that statutes allowing prejudgment attachment without a hearing and without a showing of some sort of exigent circumstances "clearly fall[] short of the demands of due process." Connecticut v. Doehr, 501 U.S. 1, 18 (1991). The Teeven court, when dealing with similar prejudgment remedies, acknowledged that "the Constitution requires a compelling need and exigent circumstances." Teeven, 1992 WL 683683, at *5 (citing Doehr, 501 U.S. 1). However, another court in this district has found that the constitutionally required compelling need and exigent circumstances existed when the Government established one of the 28 U.S.C. § 3101(b) statutory grounds. See DeGregorio, 510 F. Supp. 2d at 881 ("[The debtor], prior to issuance of the Writ, was about to dispose of real property owned by him and convert that property into money in a manner prejudicial to the United States with the effect of hindering, delaying, or defrauding the United States. The United States established a compelling need and exigent circumstances supporting prejudgment remedies to secure its claim of debt."). Additionally, in Teeven the court noted that its prior opinion found that the Government had demonstrated a compelling need and exigent circumstances by showing "reasonable cause to believe that the defendants had or were about to convert the debtor's property into money, securities, or evidence of debt in a manner prejudicial to the United States with

the effect of hindering, delaying[,] or defrauding the United States." See Teeven, 862 F. Supp. at 1224 n.42 (citing 28 U.S.C. § 3101(b)(1)(C)).

This Court adopts a similar approach. By showing grounds for issuance of the prejudgment remedies under 28 U.S.C. § 3101(b)(1)(B) and § 3101(b)(1)(C), the Government demonstrated a compelling need and exigent circumstances sufficient to satisfy the Constitution. This demonstration of a compelling need and exigent circumstances, together with the § 3101(d)(2) post-deprivation hearing, obviates any constitutional concerns. The Court thus finds that the Government complied with the Constitution in obtaining the prejudgment Writs of Attachment and Garnishment.

## III. Conclusion

Based on the evidence submitted by the parties, the testimony presented at the hearing, and applicable law, the Court finds that the Government complied with all statutory and constitutional requirements in its Application for Prejudgment Writs of Attachment and Garnishment (Doc. 60). Accordingly, it is **ORDERED** as followed:

1.    Defendants' Motion to Quash Order Granting Application for Prejudgment Remedies and to Dissolve Prejudgment Writs of Attachment and Garnishment (Doc. 79) is **DENIED.**

2.    Defendants' Objection to Requests for Prejudgment Financial Discovery, Motion for Protective Order, and Motion to Quash Non-Party Subpoena (Doc. 80) is **DENIED WITHOUT PREJUDICE.**

**DONE** and **ORDERED** in Orlando, Florida, on October 19, 2018.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Parties